Ilene F. Brookler Bar #269422
Richard D. Greenfield
Marguerite R. Goodman
GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: 917-495-4446
ibrookler@gmail.com
whitehatrdg@earthlink.net
twowhitehats@earthlink.net

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**L. M. BACK**, Individually and
Derivatively on behalf of
**INTUITIVE SURGICAL, INC.**

Plaintiff,

v.                                    Civil Action No.

**GARY S. GUTHART, LONNIE M.
SMITH, CRAIG H. BARRATT, ERIC
H. HALVORSON, AMAL M.
JOHNSON, ALAN J. LEVY,
FLOYD D. LOOP, MARK J. RUBASH,
GEORGE STALK, JR., COLIN
MORALES, MARSHALL M. MOHR,
SALVATORE J. BROGNA, AUGUSTO
V. CASTELLO, JEROME J. MCNAMARA,
and MARK MELTZER,**

Defendants,
                    and

**INTUITIVE SURGICAL, INC.**

Nominal Defendant.

**COMPLAINT**

I.      **NATURE OF THE ACTION AND SUMMARY OF THE CLAIMS**

1.      This is a shareholder's action brought by Plaintiff derivatively on behalf of

Nominal Defendant Intuitive Surgical, Inc. ("Intuitive" or the "Company") against the Individual

Defendants, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure. No claims are

asserted herein against Intuitive.

2.      The allegations in this Complaint are made upon Plaintiff's personal knowledge with regard to its own acts and upon information and belief as to all other matters.  Plaintiff's information and belief is based upon, among other things, the investigation of its counsel, Greenfield & Goodman, LLC, which included, *inter alia*, review of: (i) materials created by the Food and Drug Administration (the "FDA") in connection with its regulatory oversight of Intuitive; (ii) Company filings with the U.S. Securities and Exchange Commission (the "SEC"); (iii) court records, including filings in Civil Action No. 14-0515 (N.D. Cal. 2014); (iv) Company press releases and earnings call transcripts; and (v) scholarly studies, news articles, analyst reports, and other publicly available information.

3.      Plaintiff asserts claims for breach of fiduciary duty against the current members of the Board of Directors (the "Board") and certain of its executives during the period commencing approximately on or about April 11, 2011 and continuing through the present (the "Relevant Period"). Following discovery, Plaintiff may expand the Relevant Period.

4.      The Individual Defendants, collectively and individually, initiated and/or actively participated in a course of conduct that was designed to, and did as described below:

(a) conceal information regarding known design defects of the *da Vinci* system including the failure to provide adequate instruction to surgeons using the system;

(b) fail to report the Tip Cover problem to the FDA;

(c) fail to report on a timely basis to the FDA adverse events based on serious injuries and deaths caused by surgeries using the system;

(d) fail to notify the FDA of corrective actions made to the *da Vinci* system;

(e) fail to implement appropriate regulatory reporting and internal controls;

(f) made materially false and misleading statements in SEC filings and to the public regarding the safety of the *da Vinci* system and the status of the Company's regulatory compliance;

(g) fraudulently misrepresented its exposure to potential lawsuits to insurance carriers; and

(h) engaged in illegal and/or otherwise improper insider selling of Intuitive stock.

## II.  JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C.§1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000 exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. .§1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

6.      Venue is proper in this district because a substantial portion of the wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.

## III. PARTIES

### A.      Plaintiff

7.      Plaintiff L. M. Back owns and has continuously owned common stock of Intuitive during the period of the wrongdoing alleged herein.  Plaintiff is a citizen of the State of New Jersey.

**B.    Nominal Defendant Intuitive**

8.    Nominal Defendant Intuitive is a Delaware corporation headquartered in Sunnyvale, California.  It became a publicly traded company in June 2000 and trades on NASDAQ under the ticker symbol "ISRG."

9.    Intuitive is the global leader in robotic-assisted surgery and the designer, manufacturer, and marketer of the *da Vinci* system.  Using the *da Vinci* system, surgeons can perform operations remotely with tiny instruments attached to robot arms threaded into a patient's body through small incisions.

10.    The *da Vinci* system is Intuitive's only product.  Nearly all of Intuitive's revenue is derived from selling the *da Vinci* system, selling component parts to existing *da Vinci* system owners, and servicing previously sold *da Vinci* systems.  Intuitive generated almost $1.8 billion in revenue in 2011, almost $2.2 billion in revenue in 2012, and almost $2.3 billion in revenue in 2013.  Due to the revelation of serious health and safety issues with the *da Vinci* system, the Company's revenues declined in 2014 to $2.1 billion.

**C.    Director Defendants**

11.    Defendant Gary S. Guthart has been employed by Intuitive since 1996, serving as a director since 2007, President since 2007 and as CEO since 2010.  Guthart received more than $5.04 million in 2012 and $2.46 million in 2013 for his service as director and in his capacity as an executive of Intuitive.  Guthart sold 17,000 shares of Intuitive stock at artificially inflated prices and received approximately $8.7 million in proceeds.  Upon information and belief, Guthart is a citizen of California.  Guthart is not "independent" under Intuitive's standards or the standards of NASDAQ. He is named as a defendant herein as an officer and director of Intuitive.

12.    Defendant Lonnie M. Smith has been a director at Intuitive since 1997 and Chairman of the Board since January 2013.  Smith was Intuitive's CEO from June 1997 until

January 2010 and an executive officer until 2013.  Smith received more than $825,000 in 2012 and $445,000 in 2013 for his service to the Company. Smith sold 187,422 shares of Intuitive stock at artificially inflated prices and received approximately $100 million in proceeds.  Upon information and belief, Smith is a citizen of California. Smith is not "independent" under Intuitive's standards or the standards of NASDAQ. He is named as a defendant herein as an officer and director of Intuitive.

13.    Defendant Craig H. Barratt has served as director and a member of the Governance Committee since April 2011.  Barratt received more than $390,000 in 2012 and $297,000 in 2013 for his service as a director and committee member.  Upon information and belief, Barratt is a citizen of California.

14.    Defendant Eric H. Halvorson has served as director and member of the Audit Committee since June 2003, and as Chairman of the Compensation Committee since 2010.  Halvorson received more than $400,000 in 2012 and $309,000 in 2013 for his services.  Halvorson sold 4,500 shares of Intuitive stock at artificially inflated prices and received approximately $2.5 million in proceeds.  Upon information and belief, Halvorson is a citizen of California.

15.    Defendant Amal M. Johnson has served as director and member of the Compensation Committee since April 2010.  Johnson received more than $390,000 in 2012 and $297,000 in 2013 for her services.  Upon information and belief, Johnson is a citizen of California.

16.    Defendant Alan J. Levy has served as director and member of the Compensation Committee since 2000, and Chairman of the Governance Committee since 2003.   Levy received more than $400,000 in 2012 and more than $307,000 in 2013 for his services.  Levy sold 6750

shares of Intuitive stock at artificially inflated prices and received approximately $3.4 million in proceeds.  Upon information and belief, Levy is a citizen of California.

17.     Defendant Floyd D. Loop has served as director and member of the Governance Committee since 2005.  Loop received more than $390,000 in 2012 and $297,000 in 2013 for his services.  Loop sold 5,000 shares of Intuitive stock at artificially inflated prices and received approximately $2 million in proceeds.  Upon information and belief, Loop is a citizen of Ohio.

18.     Defendant Mark J. Rubash has served as director and Chairman of the Audit Committee since October 2007.  Rubash received more than $400,000 in 2012 and $309,000 in 2013 for his services.  Upon information and belief, Rubash is a citizen of California.

19.     From March 2012 to June 2013, Defendant Rubash was the Chief Financial Officer of Heartflow, Inc. ("Heartflow"), a privately held medical diagnostic services company. Defendant Smith has been a member of the Heartflow board since at least December 2011.

20.     Defendant George Stalk, Jr. has served as director since 2007 and member of the Audit Committee since 2009.  Stalk received more than $390,000 in 2012 and $299,000 in 2013 for his services.  Upon information and belief, Stalk is a citizen of Canada.

21.     Defendants Guthart, Smith, Barratt, Halvorson, Johnson, Levy, Loop, Rubash, and Stalk are collectively referred to as the "Director Defendants."  Halvorson, Rubash, and Stalk are collectively referred to as the "Audit Committee Defendants."  Halvorson, Johnson, and Levy are collectively referred to as the "Compensation Committee Defendants."  Levy, Barratt, and Loop are collectively referred to as the "Governance Committee Defendants." By acting as described herein, each of the Director Defendants has breached his duty of loyalty owed to Intuitive and its shareholders and put his own financial interests before the Company's best interests.

1

### D.    Officer Defendants

2

22.    Defendant Marshall M. Mohr has been the Chief Financial Officer and Senior

3

Vice President of Intuitive since March 2006.  Mohr received more than $2.63 million in 2012

4

and $1.91 million in 2013 as compensation.  Mohr sold 26,800 shares of Intuitive stock at

5

artificially inflated prices and received approximately $15 million in proceeds.  Upon

6

information and belief, Defendant Mohr is a citizen of California.

7

8

23.    Defendant Salvatore J. Brogna has been with the Company since 1999, and the

9

Senior Vice President for Productive Development at Intuitive since 2010.  Brogna sold 39,042

10

shares of Intuitive stock at artificially inflated prices and received approximately $18.3 million in

11

proceeds.  Upon information and belief, Brogna is a citizen of California.

12

24.    Defendant Augusto V. Castello has been with the Company since 2002, and he

13

has been the Senior Vice President for Product Operations at Intuitive since 2007. Castello sold

14

26,250 shares of Intuitive stock at artificially inflated prices and received approximately $15.1

15

million in proceeds.  Upon information and belief, Castello is a citizen of California.

16

17

25.    Defendant Jerome J. McNamara has been with the Company since 1999, and has

18

been Executive Vice President for Worldwide Sales and Marketing at Intuitive since 2007.

19

McNamara received compensation of more than $4.35 million in 2012 and $2.36 million in

20

2013.  McNamara sold 55,625 shares of Intuitive stock at artificially inflated prices and received

21

approximately $31.5 million in proceeds.  Upon information and belief, McNamara is a citizen

22

23

of California.

24

26.    Defendant Mark Meltzer has been Senior Vice President, General Counsel and

25

Chief Compliance Officer since 2007.  In 2012, Meltzer received almost $2.4 million in

26

compensation.  Meltzer sold 27,500 shares of Intuitive stock at artificially inflated prices and

27

28

received approximately $15.2 million in proceeds.  Upon information and belief, Meltzer is a citizen of California.

27.    Defendant Colin Morales has been the Senior Vice President for Customer Support at Intuitive since 2010.  Morales sold 4,760 shares of Intuitive stock at artificially inflated prices and received approximately $2.3 million in proceeds.  Upon information and belief, Morales is a citizen of California.

28.    Defendant David J. Rosa joined Intuitive in 1996 and has been the Executive Vice President and Chief Scientific Officer since 2014.  Rosa was Senior Vice President for Emerging Technologies and Procedures.  Rosa received more than $2.57 million in 2012 and $2.56 million in 2013 as compensation.  On August 1, 2013, Rosa received a $30,000 special bonus for managing Intuitive's regulatory challenges.  Rosa sold 11,000 shares of Intuitive stock at artificially inflated prices and received approximately $5.7 million in proceeds.  Upon information and belief, Rosa is a citizen of California.

29.    Defendants Guthart, Smith, Mohr, Brogna, Castello, McNamara, Metzler, Morales, and Rosa are collectively referred to as the "Officer Defendants" and together with the Director Defendants as the "Individual Defendants." By acting as described herein, each of the Officer Defendants has breached his duty of loyalty owed to Intuitive and its shareholders and put his own financial interests before the Company's best interests.

30.    Defendants Guthart, Smith, Halvorson, Levy, Loop, Mohr, Brogna, Castello, McNamara, Meltzer, Morales, and Rosa are collectively referred to as the "Insider Selling Defendants."  Collectively, the Insider Selling Defendants sold over 411,000 shares of Intuitive stock for over $219 million in proceeds during the Relevant Period.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Intuitive's Business

31.    Intuitive was founded in 1995 to adapt a prototype robotic surgery platform developed for the U.S. Army to commercial use.  In January 1999, Intuitive launched the *da Vinci* system.  This system consists of a console with a "video game style" controls and a live video stream from inside a patient's body, a patient-side cart from which the system's robotic arms manipulate surgical instruments that are known as "EndoWrist."  The EndoWrist instruments are a set of surgical tools designed for specific surgical tasks like cutting, clamping, suturing and cauterizing.  Surgeons use these instruments to make small incisions and perform surgery.

32.    In 2000, the *da Vinci* system became the first robotic surgery system cleared by the FDA for laparoscopic surgeries.  Since then, the system has been approved for thorascopic surgery and certain cardiac, urologic, gynecologic, pediatric and trans-oral procedures.

### B.    The Tip Cover Defect

33.    As far back as January 2010, Intuitive's management and Board became aware of a serious design defect in the *da Vinci* system, which resulted in hundreds of serious injuries and dozens of fatalities.

34.    Certain instruments used by the *da Vinci* system carry an electrical charge and are used to coagulate, cut, dissect or cauterize tissue.  The electricity used by these Advanced Energy Instruments is supposed to be contained by a device referred to as the "Tip Cover."  The Tip Cover is a silicon and plastic sheath that is intended to prevent electricity from escaping the intended area.

35.    Despite the fact that it is a known common practice for surgeons to clean their instruments mid-surgery by scraping tissue and fluids off of one tool, and despite the fact that

Intuitive admitted to the FDA investigator that it was aware of the common practice, Intuitive did not take this user need into consideration when designing the system.

36.    Thus, due to a design flaw, the Tip Cover can fail to stand up to wear and tear. Specifically, during intra-surgical cleaning, surgeons can inadvertently crack or slit the Tip Covers.  The Tip Cover is then compromised, and electricity can "arc" from the instrument into the patient's body.

37.    Arcing can burn soft tissue inside the patient's body during surgery which can be potentially fatal, particularly because arcing frequently occurs outside the surgeon's field of vision, which is limited by the *da Vinci* console.

38.    Besides the fact that Intuitive failed to consider the common intra-surgical cleaning practices, in designing the system, Intuitive's senior management and Board undertook concerted efforts to conceal the design defect even after receiving complaints of arcing, and systematically under-reported the injuries and their seriousness, putting patients at risk and in violation of FDA regulations.

39.    Bloomberg reported in March 2013 that there were at least 70 deaths due to this arcing problem.

40.    In May 2013, the FDA determined that malfunctions of the cannulas, small plastic tubes inserted into the incision and through which the Endo Wrist instruments pass into the patient's body, contribute to the arcing problem.

**C.    Discovery of Design Defect and Refusal to Comply with FDA Regulations**

41.    In January 2011, the Ohio State University Medical Center Department of Urology published in the *Journal of Urology*, a study entitled *"Robotic instrument insulation failure: initial report of a potential source of patient injury."*  The study reported that in a study

of over 450 robotic procedures conducted between July 2008 and January 2009, there was a 2.6% tip cover failure rate.

42.    In August 2011, the Hospital Quiron Madrid, Santa Creu I Sant Pau, Barcelona, and Mayo Clinic Arizona published a study in the *American Journal of Obstetrics & Gynecology* entitled "*Insulation failure in robotic and laparoscopic instrumentation.*"   The study found that insulation failure occurred at a rate of approximately 4:1 in robotic laparoscopic surgery when compared to traditional procedures.

43.    Between January 2010 and December 2011, Intuitive received 134 complaints from *da Vinci* system users related to defective tip covers during intra-operative cleaning of the mono-polar curved scissors and fenestrated bi-polar scissors,  off-label marketing, and other issues, and Intuitive filed 82 MDRs concerning arcing.

44.    Pursuant to FDA reporting regulations, Intuitive was required to report any adverse event involving the *da Vinci* system that resulted in a serious injury or fatality.  Despite receiving dozens of such reports regarding the arcing problem during the Relevant Period, Intuitive failed to report all of these incidents to the FDA, and, instead systematically underreported and downplayed these adverse events to the FDA and the public.  The period of the greatest under-reporting by the Company was from the second quarter, 2010 through the third quarter, 2012.

**D.    Intuitive's Secret Recalls**

45.    On October 10, 2011, Intuitive sent letters directly to hospitals and surgeons providing suggestions and recommendations on how to avoid arcing (the "Tip Cover Corrective Action Letters").  Even though the Individual Defendants were aware of the arcing problem and its severity, this action was not timely reported to the San Francisco District Recall Coordinator.

46.     In response to 13 complaints and 5 MDRs filed between July 2009 and October 2011, on October 13, 2011, Intuitive sent letters to *da Vinci* owners informing them that, despite prior representations to the contrary, the *da Vinci* system was not approved for thyroidectomies (the "Thyroidectomies Corrective Action Letters"). Similarly, as with the Tip Cover Corrective Action Letters, this action was not reported to the San Francisco District Recall Coordinator until April 11, 2013, and even then Intuitive failed to represent accurately that there had been 5 associated MDRs.  Such behavior was brazen given that Intuitive's senior management had been warned by the FDA to refrain from this type of behavior in the FDA's 483 report issued on December 20, 2002 and an untitled letter from the FDA dated February 19, 2008.

47.     In response to 17 complaints about cannulas and 2 complaints about flush ports, on October 17, 2011, Intuitive sent letters to *da Vinci* clients "providing information" regarding the inspection of cannulas, proper flushing of instruments, and the proper transportation of the system between buildings (the "Cannula Corrective Action Letters").  Once again, this action was not timely reported to the San Francisco District Recall Coordinator.

48.     On January 24, 2013, Intuitive sent letters to clients attaching an updated User Manual "clarifying" that, despite prior representations, the *da Vinci* system was not cleared for pediatric patients (the "Pediatric Patient Corrective Action Letters").

49.     The FDA discovered in its inspection of Intuitive's facilities in April and May 2013 that, instead of reporting the Tip Cover problem to the FDA, Intuitive's management launched a secret recall campaign in an attempt to address the issue without government monitoring or public scrutiny.

50.     The FDA found that the Tip Cover, Thyroidectomies, Cannula, and Pediatric Patient Corrective Action Letters each constituted a Class II recall taken to reduce the risk of health posed by a regulated medical device.  As such, pursuant to FDA regulation, 21 C.F.R.

806.10(b), Intuitive was required to report these field corrections within 10 business days.

51.     Despite their knowledge of the importance of doing so, the Individual Defendants did not timely disclose these Corrective Action Letters to the FDA.  Instead, the Individual Defendants turned a blind eye to the program of covert recalls.  Such failure to timely report these corrective actions to the FDA, in and of itself, constituted a serious violation of applicable law and regulations.  Such violations were particularly egregious given that in December 2002 and in February 2008, the FDA had warned the Company for failing to adequately report corrective actions, of which warnings each of the Individual Defendants was aware.

52.     Additionally, Intuitive's wrongful marketing of "off-label" uses of the *da Vinci* system was another serious violation of FDA regulations, and one for which the FDA previously admonished Intuitive in an April 12, 2001 warning letter.  Despite the warning, of which the Individual Defendants were aware, Intuitive did not establish procedures for dealing with design changes.

53.     As each of the Individual Defendants knew or should have known, Intuitive lacks appropriate internal controls for reporting adverse events and corrective actions to the FDA. Intuitive's Board and management knew of and allowed these failures to occur.

### E.      FDA Investigation and Market Response

54.     In September 2012, the FDA met with representatives of the Company, including Richard Reeves, Vice President of Regulatory Affairs, at which time Intuitive was directed to change its adverse events reporting practices.  As a result of the meeting, Intuitive did begin to change its MDR reporting practices, leading to a dramatic increase in the number of MDRs filed. At the direction of the Officer Defendants, Intuitive did not disclose that the meeting with the FDA had occurred, nor was the change in MDR reporting practices disclosed until March 2013.

55.     In January 2013, the FDA launched a lengthy investigation into Intuitive's FDA reporting practices, taking an unusual step of surveying and interviewing surgeons at key hospitals that actually used the *da Vinci* system to list any complications, and inspecting the Company's facilities.

56.     The FDA's heightened interest in Intuitive was not disclosed until a February 28, 2013 article in Bloomberg entitled *Intuitive Robot Probe Threatens Trend-Setting Surgeries*. Bloomberg revealed that, due to increased adverse events reported, the FDA was investigating the safety of robot surgery made by Intuitive "raising questions about the prospects of one of the hottest technologies in health care." An FDA spokeswoman told Bloomberg that the agency was "trying to determine whether a rise seen in incident reports sent to the [FDA] are 'a true reflection of problems' with the robots, or the result of other issues.'"

57.     The revelations of previously-concealed and highly material information in the Bloomberg article apparently caused the first in a series of substantial stock drops.  After Bloomberg's article was published, Intuitive's stock price dropped over 11% from $573.52 to $509.89 per share.

58.     On March 5, 2013, Bloomberg published an article entitled *Robosurgery Suits Detail Injuries as Death Reports Rise*, publicizing the death of one particular patient, and reporting that at least 70 deaths have occurred since 2009.  According to Bloomberg, "tough new questions about safety raised in lawsuits and in adverse incident reports to U.S. regulators may threaten the company's growth."

59.     On March 13, 2013, Intuitive issued a press release, conceding that its MDR reporting practices, prior to September 2012, were deficient.  The Company stated that it changed its practice so that more adverse events would be categorized as "serious injury" as opposed to "other" triggering a reported event.

60.     On March 15, 2013, *Bloomberg* reported that the American Congress of Obstetricians and Gynecologists believed "expertise with Intuitive's *da Vinci* robot system is limited and surgeons learning the new technology may have higher rates of complications."

61.     Between February 27 and March 15, 2013, Intuitive's stock price fell nearly 20% from $573.52 to $459.44 per share.

62.     On April 11, 2013, Intuitive reported various corrective actions to the San Francisco District Coordinator, as discussed above.

63.     The FDA's investigation concluded in May 2013 and the FDA issued a Form 483 to Defendant Guthart.  The following four objectionable conditions were listed: (1) failure to report four corrective actions; (2) failure to properly report corrective actions when they were made in April 2013; (3) failure to have "adequately established" "procedures for design changes"; and (4) failure to have "adequately documented" design input requirements.

64.     On June 17, 2013, Intuitive responded to the FDA's findings and argued that the Company had the authority to have its corrections, recalls and labeling reviewed by a third party expert instead of the FDA.

65.     On July 16, 2013, the FDA issued a warning letter to Intuitive addressed to Defendant Guthart, having found that Intuitive's response was "incomplete and inadequate."

66.     Specifically, the FDA stated that the Tip Cover and cannula were "adulterated devices…in that the methods used in, or the facilities or controls used for its manufacture…are not in conformity with the Current Good Manufacturing Practice."

67.     Echoing the 2013 Form 483, the warning letter criticized Intuitive's failure to adequately document design input requirements.  Intuitive had informed the FDA investigator that it was aware that the design of the tip cover and cannula could cause arcing.  The FDA criticized Intuitive's failure, under the circumstances, to develop an alternate design or

sufficiently warn surgeons.  According to the FDA, Intuitive's failure to provide a response "to the root cause of this critical missing design input in design documentation" was sorely lacking.

68.    The FDA warned Intuitive that it needed to provide the FDA with a step by step plan to correct the violations and ensure they would not occur again.  "Failure to correct may result in regulatory action being initiated by the FDA without further notice.  [Possible] actions include, but not limited to, seizure, injunction, and/or civil money penalties."  The FDA further warned it may advise "federal agencies…of the issuance of Warning Letters about devices so that they may take this information into account when considering the awarding of contracts."

69.    On July 18, 2013, Intuitive publicly announced that the FDA issued a warning letter.  Intuitive's stock price declined approximately 7% from 421.47 to $392.67 per share.The receipt of a warning letter placed certain limits on Intuitive's ability to obtain FDA issued Certificates to Foreign Government, used for new products and the re-registration of products in certain foreign countries.

70.    On July 19, 2013, Trefis issued an analyst report stating that the FDA warning letter was "another blow" to the Company and "will only worsen conditions as it will make it harder for the company to sell the system."

71.    Also on July 19, 2013, a Motley Fool research report stated, "it wasn't the numbers that sent Intuitive stock nuclear on Thursday after the closing bell.  The FDA has picked and prodded at the robotic surgical device maker for some time, but regulators' investigations came to a big climax that culminated in a gut-wrenching one-two punch for investors."  According to the report, "the slump in system sales means that the increasing talk regarding safety and legal issues at the company are catching up to Intuitive's financials – and investors.  Thursday's warning by the FDA may only exacerbate that trend."

72.    On July 20, 2013, Bloomberg published an article entitled, "*Intuitive Surgical Declines on Warning Letter from FDA*."  The article stated that Intuitive's "sales trajectory have have hit a wall amid regulatory scrutiny over adverse events during operations using its surgical robots and concerns on whether the $1.5 million devices are cost effective."

73.    On October 6, 2013, a Seeking Alpha research report entitled *"Wait for the Next Shoe to Drop Before Buying Intuitive Surgical"* stated that Intuitive "has had a difficult 2013 and its troubles may continue.  Despite theories that this weakness is related to Obamacare implementation concerns or reductions to hospital budgets, [Intuitive's] woes are directly and almost exclusively due to the…FDA[] warning letter and the related investigation into the efficacy, safety and use of the company's 'da Vinci' surgical robot, which the company disclosed last quarter.  Further, despite theories that the company's recent weakness is probably over, it probably is not.  What investors must now recognize is that the government investigations are generally slow and that [Intuitive's] troubles here are bound to continue for the duration of it. [Intuitive] was priced for substantial growth, and though it is still growing, the company's development shall be stunted until the conclusion of FDA scrutiny.  Hospitals will refrain from purchasing new da Vinci robots, whether or not they want or can afford them, while this overhanging regulatory concern persists."

74.    The FDA re-inspected Intuitive's facilities in February and March 2014.  At the end of that inspection, the FDA issued another From 483 listing five observations related to quality management system improvement.

75.    Management's continued mis-reporting of serious operating and disclosure problems with the *da Vinci* system and the FDA's investigations in connection therewith have resulted in Intuitive having to expend millions of dollars of the Company's funds.

76.    As disclosed in Intuitive's most recent 10-K Report for 2014:

We responded to the FDA with a corrective action plan for those observations. On April 25, 2014, we received a closure letter from the FDA stating that the observations in the July 16, 2013 Warning Letter had been addressed, and on April 25, 2014, we also received an Establishment Inspection Report (EIR) confirming close-out of the FDA inspection. Although the FDA did not indicate whether it reviewed the promotional materials previously collected, we believe that the FDA's review of these materials and all other 2013 findings are now closed based on receipt of both the Warning Letter close-out and the EIR.

77.    It cannot be determined at this point whether management's optimism in that regard is justified.  Indeed, Intuitive, itself, stated in the 2014 10-K Report: "However, we cannot assure that the FDA will not find other observations in future inspections. The FDA previously inspected our Sunnyvale, California facilities in January 2012 and did not issue a Form FDA 483 as a result of this inspection."

78.    On April 9, 2014, Motley Fool's report entitled, "Why Intuitive Surgical Inc. Shares Were Sliced," discussed the expected 59% decrease in revenue in the first quarter of 2014 for the da Vinci system and stated "I do believe that the overhang form the ongoing investigation into the safety and efficacy of da Vinci surgical system by the Food and Drug Administration had something to do with the drop in demand."

**F.    SEC Missatatements**

79.    Besides failing to report health and safety concerns to the FDA, as part of its efforts to conceal the problems, the Individual Defendants made materially false and misleading statements in SEC filings and public pronouncements regarding the Company's financial and operational health.

80.     During the Relevant Period, each of the periodic filings include nearly identical, boilerplate "risk factors" which demonstrate that the Individual Defendants knew and understood their regulatory responsibilities and the severe ramifications of non-compliance.

81.     Each of the periodic filings stated that since the *da Vinci* system is a Class II medical device, Intuitive's "products and operations are subject to extensive and rigorous regulations by the FDA, the State of California and countries or regions in which we market our products…We must continually keep abreast of these standards and requirements and integrate compliance to these with the development and regulatory documentation of our products."

82.     Each of the periodic filings state that the Company must comply with "the FDA's general prohibition against false or misleading statements in the labeling or promotion of products for unapproved or 'off-label' uses; the Medical Device Reporting regulation, which requires that  manufacturers report to the FDA if their device may have caused or contributed to a death or serious injury or malfunctioned in a way that would likely cause or contribute to a death or serious injury if it were to occur." As the Individual Defendants knew or should have known, Intuitive failed to make the required MDR reports to the FDA within 30 calendar days of becoming aware of adverse events, none of which material failures were disclosed publicly.

83.     Additionally, the periodic filings warned that the Company must make "adequate use of the Corrective and Preventive Actions process to identify and correct or prevent significant systemic failures of products or processes or in trends which suggest the same; and the reporting of Corrections and Removals, which requires that manufacturers report to the FDA recalls and field corrective actions taken to reduce a risk to health or to remedy a violation of the [Act] that may pose a risk to health."

84.     Each periodic filing warned that failure to comply with the FDA regulations "could lead to a wide variety of enforcement actions, ranging from a regulatory letter to a public

Warning Letter to more severe civil and criminal sanctions including the seizure of our products and equipment or ban on the import or export of our products.  Failure to comply with applicable requirements could lead to an enforcement action that may have an adverse effect on [Intuitive's] financial condition and results of operations."

85.    The periodic filings reveal that the Individual Defendants were well-aware of their and the Company's regulatory obligations.  They were aware of the Company's reporting and off-label marketing issues, but failed to implement proper internal controls or to resolve the issues.  During the Relevant Period, the Individual Defendants knowingly caused and permitted the Company to engage in off-label marketing and to fail to comply with FDA reporting requirements, thereby exposing the Company to legal and regulatory risks.  Their repeated failure to comply with regulations was the result of a willful effort to keep quiet the Company's health and safety problems.

86.    In addition, the Board and senior management caused Intuitive to continually misrepresent the Company's financial and operational health in its periodic filings by announcing, and often increasing revenue guidance while failing to disclose Intuitive's severe legal and regulatory problems.

87.    It was not until the Company's April 19, 2013 10-Q filing whereby the change in MDR reporting practices was finally disclosed. In such 10-Q Report, the Company disclosed that it had seen a "substantial increase" in claims from those who allegedly suffered injuries after undergoing *da Vinci* surgery and explained that this increase was due to an "administrative change" and not a change in product performance.  In reality, as the Individual Defendants knew or should have known, Intuitive had been under-reporting serious injuries and deaths associated with its product in order to keep product sales and stock prices artificially high.

### G.    Invalidation of Products Liability Insurance

88.    In January 2013, Intuitive's management approached the Illinois Union Insurance Co. ("IUIC") and Navigators Specialty Insurance Company ("NSIC") about entering into insurance policies which would cover up to $15 million in payments and defense costs for product liability lawsuits.

89.    Both IUIC and NSIC requested "loss runs" from Intuitive, indicating the number of claims on Intuitive's prior insurance policies.  The loss runs provided by Intuitive showed 9 claims for the period March 1, 2011 through March 1, 2012 and 25 claims for the period March 1, 2012 through March 1, 2013.  As Intuitive's management knew, the loss runs failed to disclose that the Company had entered into tolling agreements with several potential claimants.

90.    The existence of the tolling agreements was not disclosed until April 19, 2013 when Intuitive filed its 10-Q Report with the SEC.  This disclosure was made a month after the insurance policies went into effect.

91.    On October 21, 2013, IUIC sued Intuitive in this Court, seeking to rescind Intuitive's products liability insurance policy on the grounds that the Company had fraudulently misrepresented the extent of its exposure to potential lawsuits.

92.    On December 16, 2013, NSIC, together with IUIC, sued Intuitive in a substantially similar lawsuit in this Court.

93.    In answering the complaints, the Company admitted that it did not publicly disclose the tolling agreements until April 19, 2013.

94.    The Individual Defendants breached their fiduciary duties by misleading or allowing Intuitive to mislead IUIC and NSIC into thinking the Company's products liability exposure was considerably less than it knowingly was, thereby jeopardizing the validity of its liability insurance coverage.

95.     The Company faces at least 102 product liability lawsuits.  Due to the Individual Defendants' misconduct in withholding information about products liability lawsuits from Intuitive's insurance carriers, the potential liability may not be covered, in whole or in part, by valid insurance policies, and the Company may be responsible for all pending, threatened or contemplated products liability lawsuits.

### H.    Insider Trading

96.     During the Relevant Period, the Insider Selling Defendants, 12 of Intuitive's directors, including a majority of the Director Defendants and Audit Committee Defendants, made millions of dollars selling shares that were suspiciously timed and while in possession of material, non-public information.

97.     Collectively, Defendants Guthart, Smith, Halvorson, Levy, Loop, Mohr, Brogna, Castella, McNamara, Meltzer, Morales, and Rosa sold over 411,000 shares of Intuitive stock for over $219 million in proceeds.  Guthart sold 17,000  Intuitive shares for approximately $8.7 million in proceeds; Smith sold 187, 422 Intuitive shares for approximately $100 million in proceeds, Halvorson sold 4500 Intuitive shares for approximately $2.5 million in proceeds, Levy sold 6750 Intuitive shares for approximately $3.4 million in proceeds, Loop sold 5,000 Intuitive shares for approximately $2 million in proceeds, Mohr sold 26,800 shares for approximately $15 million in proceeds, Brogna sold 39,042 Intuitive shares for approximately $18.3 million in proceeds, Castello sold 26,250 Intuitive shares for approximately $15.1 million in proceeds, McNamara sold 55,625 shares for approximately $31.5 million in proceeds, Meltzer sold 27,500 shares for approximately $15.2 million in proceeds, Morales sold 4,760 Intuitive shares for approximately $2.3 million in proceeds, and Rosa sold 11,000 Intuitive shares for approximately $5.7 million in proceeds.

98.    Each of the Insider Selling Defendants breached his fiduciary duties to the Company by selling shares while knowing the following proprietary information: (a) design defects of the *da Vinci* system; (b) lack of design input requirements and an alternative design; (c) the Company's failure to comply with FDA reporting regulations of adverse events; (d) the covert recalls and the Company's failure to report them to the FDA; (e) wrongful off-label marketing of the system; (f) lack of appropriate internal controls; (g) falsity of statements made in SEC filings regarding the safety of the system and compliance with regulations; and (h) exposure in lawsuits due to scheme of renewing insurance while hiding product liability exposure.

99.    The Insider Selling Defendants purposely withheld information from the FDA in order to cash out massive amounts of stock at artificially inflated prices and take advantage of the window between the covert recalls in October 2011 and the FDA's eventual discovery of the truth, which they knew would cause Intuitive stock prices to plummet.

100.    Defendants McNamara, Levy, and Loop sold 9,257 shares on October 21, 2011 for almost $3.75 million, and Defendant Smith sold 15,000 shares on October 25, 2011 for almost $6.3 million.  These insider sales occurred shortly after the Company's covert recalls, in violation of FDA regulations, and after the Board's authorization for stock repurchases by another $500 million which were themselves a manifestation of the Board's breach of fiduciary duty.  Because these defendants had access to information regarding the recalls which were not made public, they had a duty to refrain from selling their shares under these circumstances.

101.    Additional insider selling occurred immediately after the Company met with the FDA in September 2012.  At that point, the Insider Selling Defendants knew that the era of under-reporting injuries and corresponding inflated stock prices was rapidly coming to an end. Between October and December 2012, Defendants Smith, Guthart, Mohr, Brogna, and

McNamara sold over 150,000 shares of stock for over $80 million.  Because these defendants had access to material, non-public information, they had a duty to refrain from selling these stock shares.

102.    Defendants Guthart, Mohr, McNamara, Meltzer, and Halvorson sold over 32,000 shares for over $18 million in January 2013, after the FDA began its investigation, but before the investigation was made public and while shares were trading at all-time highs.  They knew that Intuitive stock prices would decline once the FDA probe and reporting violations became public, which is precisely what happened a few months later, beginning in March 2013.  Because of these defendants' possession of such material, non-public information, they had a duty to refrain from selling their Intuitive shares under prevailing circumstances.

103.    Guthart, Smith, Mohr, Castello, McNamara, Meltzer, Halvorson, and Levy adopted 10b5-1 "safe harbor" plans in March 2012, and Defendant Brogna did so in June 2012, all in bad faith in order to attempt to evade liability.  Each of these plans was adopted pursuant to advice of legal counsel after such defendants knew about the secret corrective recalls, nullifying the exculpatory effect.  These defendants' adoption of these "safe harbor" plans, while in possession of proprietary information, supports a strong inference of illegal trading.

104.    Defendant Smith modified his "safe harbor" plan on February 1, 2013 after the FDA probe began before it was made public.  In addition, both Smith and Halvorson made substantial sales outside of their 10b5-1 plans.  Indeed, Smith sold almost $60 million in proceeds outside such plan.

105.    During the period January 1, 2011 through the revelations starting with the Bloomberg article, 7 of 9 current directors made substantial insider sales.  By selling during this period, Smith and the others avoided losses that would have occurred had their shares been retained until the true state of affairs began to be revealed in February 2013.

106.    Defendant Smith's 2012 sales were unusual in that he sold a total of 169,922 shares, which was close to three times higher than any year from 2007 to 2011, and resulted in a substantial reduction in his total reported stock ownership.

107.    Defendant Gutthart's sales of 11,500 shares in 2012 were unusual because in 2009, 2010, and 2011, he sold no stock.  From year end 2007 through 2011, Gutthart's reported ownership increased substantially every year, but declined in 2012.

108.    Defendant Halvorson's 2012 sale of 3,000 shares represented 36.7% of the reported shares he owned, and his 2011 sale of 3,750 shares represented 49.5% of the reported shares owned by him.  His reported ownership declined in 2012, while from 2008 forward to 2011, he increased year-end ownership or remained flat.

109.    On March 9, 2011, Defendant Stalk exercised two blocks of options, totaling 7,584 shares and sold all shares exercised.  His 2011 sales were unusual in that he disposed of all shares he owned.

110.    Defendant Rubash's 2011 sale of 9,250 shares, which represented 61.5% of the shares he reportedly held was unusual because it appears to be the only sale he made in his several years on the Board.

111.    The Individual Defendants breached their fiduciary duties by failing to implement adequate controls to ensure that 10b5-1 plans were entered into only in good faith.  The Compensation Committee Defendants, in particular, had an independent obligation to prevent the adoption of compensation plans that allowed for rampant insider trading.

## I.    Payment of Excessive Compensation

112.    Throughout the Relevant Period, the Compensation Committee Defendants established direct and indirection compensation for the Individual Defendants which were grossly excessive. Such compensation was in the form of salaries, directors fees , bonuses and

otherwise.

113.   Although the Compensation Committee Defendants purported to utilize expert opinions and comparables to justify their decisions, each of them knew or should have known that, in the context of the wrongdoing alleged herein and otherwise, such compensation was not justified and, as well, created perverse incentives to the Individual Defendants to breach their duties of loyalty to the Company.

114.   In setting executive and director compensation packages at such excessive levels, each of the Compensation Committee Defendants breached his fiduciary duty to the Company.

## I.   DUTIES OF THE BOARD AND SENIOR MANAGEMENT

115.    Each of the Individual Defendants, by reason of their positions as officers and/or directors of the Company owe fiduciary duties of loyalty, good faith, fair dealing, trust, candor, diligence, reasonable inquiry, and oversight to the Company and its stockholders.

116.   Each of the Individual Defendants knew it was his fiduciary duty and responsibility to use his utmost ability to oversee the management and/or administration of the Company's business and affairs to ensure the Company complied with all of its legal obligations and operated in a diligent, honest and prudent manner, and to ensure that effective policies, procedures, systems, and internal controls were and are in place to prevent the business practices such as those described herein.

117.   Each Individual Defendant acquiesced in at least some of the wrongful conduct described herein, thereby breaching his fiduciary duty of loyalty and good faith owed to the Company and its shareholders.  Such conduct is not the product of a valid exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which each director and officer faces a substantial.threat of personal liability.

118.    Intuitive's Code of Business Conduct and Ethics (the "Code") "applies to all directors, officers and employees" and requires that business is conducted "in accordance with all applicable laws and regulations as well as the highest ethical standards." Each of the Individual Defendants was required to "work to ensure prompt and consistent action against violations of the Code."

119.    Each of the Individual Defendants certified in writing on an annual basis that he was "responsible for knowing and understanding the policies and guidelines" in the Code and that the "ultimate responsibility to ensure" compliance "with the many laws, regulations and ethical standards affecting business rests with each of" them. Thus, the Individual Defendants' failure to ensure FDA compliance was a breach of the Code.

120.    The Code generally prohibits the pursuit of private interests that counter the Company's, but also explicitly prohibits insider trading. In each certification, the Individual Defendants agreed not to trade shares of Intuitive stock while in possession of "material nonpublic information" including "earnings or other financial results…business plans…important litigation developments, and important regulatory, judicial or legislative actions." The Individual Defendants' participation in and/or failure to prevent rampant insider trading was a breach of the Code.

121.    The Code also promulgated a policy "to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations." According to the Code, the "making of false or misleading entries, records, reports or documentation is strictly prohibited." The Individual Defendants' misleading statements to the FDA, SEC, investing public and insurers were all breaches of the Code.

122.    Under the Code, there is a duty to report any false or misleading reports and suspected violations of the Code to Defendant Metzler, the Company's General Counsel, or to

the Board's Audit Committee. Thus, Defendants Metzler and the Audit Committee Defendants would have been aware of any suspected Code violations properly reported.

123.    The Board approved a Charter for the Audit Committee on February 3, 2011. That charter establishes the Audit Committee for the primary purpose of "overseeing the integrity of the Company's financial statements, accounting and financial reporting processes and financial statement audits", "overseeing the Company's compliance with legal and regulatory requirements"; and "overseeing the Company's systems of disclosure controls and procedures and internal controls over financial reporting."

124.    The Audit Committee's members are charged with "meeting with management…to review and discuss the Company's annual…and quarterly financial statements…as well as all internal control reports…review other relevant reports or financial information submitted by the Company to any governmental body or the public…discuss earnings press releases…discuss financial information and earnings guidance provided to analysts and rating agencies…review the integrity of the Company's financial reporting processes (both internal and external), and the internal control structure…receive and review any disclosure from the Company's CEO and CFO made in connection with the certification of the Company's quarterly and annual reports filed with the SEC…review…major issues as to the adequacy of the Company's internal controls…review the effect of regulatory and accounting initiatives…review, with the Company's counsel and independent auditor legal compliance and legal matters that could have a significant impact on the Company's financial statements [and] any material reports or inquiries received from regulators, governmental agencies or employees that raise material issues regarding the Company's…compliance policies; discuss policies with respect to risk assessment and risk management, including appropriate guidelines and policies to

govern…the Company's major financial risk exposures and the steps management has taken to control them."

125.    Defendants Halvorson, Rubash, and Stalk failed to meet their independent obligations under the Audit Committee Charter to monitor Intuitive's internal controls for the reporting to the FDA of adverse events and corrective actions and for insider trading.

126.    On July 22, 2010, the Board approved the Governance Committee Charter.  That Charter made the Governance Committee responsible to "make periodic recommendations concerning the Company's corporate governance policies…establishing and administering a periodic assessment procedure relating to the performance of both the Board as a whole and its individual members…recommending improvements to the functioning and effectiveness of the Board…reviewing Directors and Officers insurance matters…reviewing Board indemnification matters."

127.    Defendants Barratt, Levy, and Loop failed to meet their independent obligations as Governance Committee members to ensure that the Board was serving its stockholders appropriately.

128.    The Compensation Committee is charged with "review and approve all compensation programs applicable to the executive officers…approve any new compensation plan or any material change to an existing compensation plan…oversee the activities of the individuals and committees responsible for overseeing the Company's compensation plans, and discharge any responsibilities imposed on the Committee by any of those plans…oversee regulatory compliance with respect to compensation matters…any other compensation matters as from time to time may be directed by the Board…reviewing and recommending the level of compensation for the Company's Board…whether the Company's compensation-related policies and practices…encourage unnecessary or excessive risk taking."

129.     As indicated above, Defendants Halvorson, Johnson, and Levy failed to meet their independent obligations as Compensation Committee members to ensure that the purported 10b5-1 plans were adopted in good faith and without material, non-public information and that insider trading through Company compensation plans were not conducted.

130.     Each of the Director Defendants breached his respective duty of loyalty and good faith by knowingly permitting management to engage in the breaches of fiduciary duty and other wrongful conduct as described herein and/or to acquiesce in such conduct and/or failed to take action since Plaintiff made his pre-suit demands on Intuitive's Board.

## II.     DERIVATIVE ALLEGATIONS

### A.     General Derivative Allegations

131.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the breaches of fiduciary duty, waste of corporate assets, unjust enrichment and other wrongful conduct by the Individual Defendants as alleged herein.

132.     Plaintiff currently owns and has continuously owned common stock in the Company beneficially during the Relevant Period.

133.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

134.     Plaintiff will adequately and fairly represent the interests of Intuitive and its shareholders in enforcing and prosecuting its rights, and has retained counsel experienced in prosecuting stockholder derivative litigation.

### B.     Plaintiff has made Pre-Suit Demand Pursuant to Rule 23.1

135.      On October 3, 2014, Plaintiff, through his counsel, Richard D. Greenfield, Esq., made a pre-suit demand by letter to the Board as required by Fed. R. Civ. P. 23.1 (the "Demand Letter").  The Demand Letter stated, *inter alia:* "On behalf of my client, I demand that the

Company sue each of yourselves, the Company's officers, other executives, auditors and legal counsel responsible for, among other wrongdoing, breach of the fiduciary duties you owe to the Company and its shareholders as set forth below."

136.    In making the demands set forth in the Demand Letter, Plaintiff was in no way conceding the disinterestedness or independence of any of the Intuitive directors.  Rather the pre-suit demands were made to give the Board the opportunity to cause the Company to assert directly, in the first instance, the claims that Plaintiff now asserts derivatively on behalf of Intuitive.

137.    In the Demand Letter, Plaintiff stated: "The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent, disinterested or can properly and objectively deal with such demands, which you cannot. Although it will be argued by your counsel that, in sending this letter, my client has conceded your independence, he does not concede your independence for all purposes or going forward (see *Scattered Corp. v. Chicago Stock Exh.,* 701 A.2d 70 (Del. 1997)."

138.    The Demand Letter goes on to say: "This letter is being sent solely for the purpose of giving you the opportunity to cause the Company to commence the demanded litigation itself and to do so promptly, as appropriate.  Each of you is personally implicated in the alleged wrongdoing, by, *inter alia*, your personal responsibility for the wrongdoing alleged above."

### C.    The Board's Wrongful Rejection of Plaintiff's Demands

139.    On October 29, 2014, after having given the Demand Letter the most cursory consideration, upon the advice of counsel, the Board rejected Plaintiff's demands.

140.    The Board's rejection of such demands was and is wrongful given the serious nature of the wrongdoing of the Individual Defendants because, its members are exposed to potential liability due to, *inter alia*, rampant insider trading and unjust enrichment, operating

Intuitive without adequate internal controls for compliance with the FDA and failure to give anything more than a cursory consideration. Indeed, upon information and belief, seriously conflicted legal counsel representing the Individual Defendants specifically advised the members of the Board to reject Plaintiff's demands out of hand.

141.    Moreover, the Director Defendants who should have considered the Demand Letter objectively and in Intuitive's sole interests, put their own interests first. They have benefited from the wrongdoing alleged herein, and have engaged in conduct to protect themselves from personal liability for their acts of mismanagement and for their breach of the fiduciary duties they owe to the Company.

142.    In light of the Director Defendants' personal culpability and responsibility for the wrongful acts described herein, they are not disinterested with respect to responding to Plaintiff's demands.

## V.    DAMAGES

143.    The Individual Defendants' misconduct resulted in the initiation of a federal securities fraud class action, 102 products liability actions, and thousands of additional claims against the Company, exposing the Company to hundreds of millions of dollars of likely litigation exposure and expenses, which may not be covered, in whole or in part, by insurance. During the year ended December 31, 2014, Intuitive announced a pre-tax charge of $82 million, reflecting its estimate of the anticipated cost of settling approximately 4,800 legal claims.

144.    The Individual Defendants' misconduct resulted in heightened regulatory scrutiny including the FDA's issuance of the July 16, 2013 Warning Letter for violating applicable FDA rules and regulations.

145.    The Individual Defendants' misconduct has harmed the Company's reputation and damaged the goodwill it has with the medical community, commentators, the press, and the public, resulting in an attendant declines in stock prices, sales and profits.

146.    As the Company admitted in its 2014 Form 10-K: "Current product liability claims have resulted in the negative publicity regarding our Company, and these and any other product liability or negligence claims or product recalls also could harm our reputation."  In addition, there have been "articles published and papers written questioning patient safety and efficacy associated with *da Vinci* surgery, the cost of *da Vinci* surgery relative to other disease management methods, and the adequacy of surgeon training.  Negative publicity, whether accurate or inaccurate, concerning our products or our Company could reduce market acceptance of our products and could result in decreased product demand and a decline in revenues."

147.    Market analysts conclude that concerns regarding the Company's non-compliance with FDA regulations have contributed to a decline in sales of its products.  Indeed, after Intuitive's regulatory problems first became publicly known in February 2013, the Company's sales revenues dropped dramatically. The Company's revenues for the third quarter of 2013 dropped from $578.5 million to $499 million, a decline of about 14%, and a 7% drop from the same quarter in the prior year.  The Company sold 101 systems, a 34.8% decline from the previous year.

## VI.  CAUSES OF ACTION

### COUNT I

(Breach of Fiduciary Duty and Waste of Corporate Assets)

148.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

149.    The Individual Defendants all owed and/or owe fiduciary duties to the Company and its shareholders to exercise candor, good faith, and loyalty.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Intuitive and its shareholders the highest obligation of good faith and loyalty in the management and administration of the affairs of the Company.

150.    The Individual Defendants consciously violated their corporate responsibilities and intentionally breached their fiduciary duties to protect the rights and interests of Intuitive and its shareholders.

151.    The Individual Defendants breached their fiduciary duties by failing to address and covering up known defects with the *da Vinci* system, and by failing to timely report adverse events and corrective actions.

152.    The Individual Defendants breached their fiduciary duties by failing to implement policies, procedures, and controls ensuring the Company's compliance with FDA regulations, and by failing to take appropriate action when informed of Intuitive's willful non-compliance with mandatory legal and regulatory FDA reporting requirements.

153.    The Individual Defendants breached their fiduciary duties by providing materially false and misleading statements in the Company's SEC filings, public statements, and insurance applications.

154.    The Insider Selling Defendants breached their fiduciary duties by engaging in extensive insider trading.  The Individual Defendants breached their fiduciary duties by failing to implement policies, procedures, and controls that would adequately prevent insider trading.

155.    As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, they have caused the Company to waste valuable corporate assets and expend its corporate funds unnecessarily.

156.    As a result of the misconduct alleged herein, Intuitive has sustained and will continue to sustain significant damages, not only monetarily, but also to its corporate image and goodwill.

157.    As a result of the misconduct alleged herein, the Individual Defendants are personally liable to the Company in an amount which cannot presently be determined.

## COUNT II

### (Unjust Enrichment)

158.     Plaintiff repeats and re-alleges each of the allegations as set forth above as if fully set forth herein.

159.    Each of the Individual Defendants was or is being unjustly and excessively compensated by the Company with compensation packages and otherwise despite the failure of their stewardship of the Company and their personal implication in the wrongdoing set forth herein.

160.    The Insider Selling Defendants sold over 411,000 shares of Intuitive stock for over $219 million in proceeds during the Relevant Period, all the while in possession of material inside information not known to the public.

161.    By acting as described herein, the Individual Defendants were unjustly enriched.

162.    Each of the Individual Defendants who have been unjustly enriched by the wrongdoing set forth in this Complaint should be required to account for and repay the Company therefor together with their earnings thereupon.

## COUNT III

### (Breach of the Duty of Loyalty)

163.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

164.    Each of the Individual Defendants were paid, directly and indirectly, substantial compensation and, as well, received other benefits not disclosed. In order to retain the perquisites and emoluments of office, they put their own personal interests before those of the Company and its shareholders.

165.    Moreover, the Insider Selling Defendants sold over 411,000 shares of Intuitive stock for over $219 million in proceeds during the Relevant Period, all the while in possession of material inside information not known to the public.

166.    By acting wrongfully as they did, the Individual Defendants breached their respective duties of loyalty to Intuitive and, as such, should be held accountable to the Company for the wrongful conduct described herein.

### VII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment as follows:

A.    Requiring the Individual Defendants to repay the Company to the extent they have been unjustly enriched by their wrongful conduct, as described herein, together with their earnings upon such amounts;

B.    Ordering the Board to take all necessary actions to reform and improve Intuitive's corporate governance, compliance and internal control procedures for the purpose of not only preventing a recurrence of the failures detailed above, but to optimize such procedures in light of relevant and current best practices;

C.    Awarding Intuitive restitution from the Individual Defendants for the damages they caused and/or the conduct they tolerated;

D.    Awarding Plaintiff and his counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated: March 4, 2015

___/s/_____
Ilene F. Brookler, #269422
Richard D. Greenfield
Marguerite R. Goodman
GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: 917-495-4446
ibrookler@gmail.com
whitehatrdg@earthlink.net
twowhitehats@earthlink.net

**Counsel for Plaintiff**